### STATE OF CONNECTICUT v. ALEX ORTIZ (AC 25879)

Schaller, McLachlan and Harper, Js.

---

Argued January 12—officially released April 25, 2006

*Nicholas P. Cardwell*, for the appellant (defendant).

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Victor Carlucci, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Alex Ortiz, appeals from the judgment of conviction rendered following his conditional plea of nolo contendere[1] to one count each of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b) and possession of a controlled substance with intent to sell within 1500 feet of a public school in violation of General Statutes § 21a-278a (b). The defendant claims that the trial court improperly denied his motion to suppress certain evidence seized from his apartment. We affirm the judgment of the trial court.

On June 24, 2002, the defendant filed a motion to suppress "all physical evidence" seized by officers with the Hartford police department from the property, buildings or vehicles located at a Hartford residence on February 8, 2002. The defendant asserted that police officers, while responding to a complaint at his apartment, entered and searched the apartment, its master bedroom and a bathroom adjacent to the master bedroom. The defendant also asserted that, during the course of the search of the master bedroom, police seized a handgun and that, during the course of the search of the bathroom, police seized money and narcotics. The defendant argued that the search and seizure violated his rights under the state and federal constitu-

---

[1] See General Statutes § 54-94a; Practice Book § 61-6.

tions because it was not conducted pursuant to a warrant.

In November, 2003, the court conducted an evidentiary hearing on the defendant's motion. Both the state and the defendant presented evidence. On February 18, 2004, in a thorough memorandum of decision, the court denied the motion to suppress.

The court set forth the following findings of fact: "Officer Giuseppe Uccello of the Hartford police department testified . . . that on February 4, 2002, he was dispatched to a 'B and E' alarm—a breaking and entering alarm—at 250 Main Street, apartment 330, in Hartford. Officer Eric Gaddy was the first respondent. Uccello described 250 Main Street as a large, multiple dwelling apartment building with more than ten floors. He met Gaddy at the ground level. He also met Carmelo Robles, an employee [of ADT Security Services, Inc. (ADT), an alarm monitoring company]. . . . It was his understanding that the alarm service had contacted the police department, resulting in his having been dispatched. They went up to the third floor. The alarm, coming from inside the apartment, could clearly be heard from the hallway. The door was locked. His main concern was that the apartment 'wasn't [being] burglarized.' . . . 'If there was a burglar inside, we didn't want an ambush.' Robles, who had a key, opened the outer door, but was initially left behind for 'security purposes' while the two officers entered. They went through various rooms, including a first bedroom, looking only in locations where a person could hide. They went through a second bedroom at the end of the hallway. This second bedroom led to a small hallway leading to another door, which was locked. Robles told the two officers that the locked room was a bathroom. Uccello noticed that the door was locked from inside and concluded that 'either somebody was hiding in there or it was somebody injured' or someone who had

fallen and 'may have been in need of medical assis-
tance.' . . . He asked Robles for a key, but Robles did
not have one. Using a screwdriver provided by Robles,
he opened the door. Prior to entering, he announced
that it was the police but heard no response. . . . The
bathroom was small with no windows. In plain view
on the ground was a cardboard shoe box with 'wads
of currency.' On the sink were bags containing white
powder and scales. Given his training and experience,
including investigations he had conducted while he was
with the narcotics division, he concluded that the apart-
ment was a narcotics and stash house, a location used
to hide illegal drugs and money. He had not observed
any visible signs of forced entry in the apartment, nor
any signs of tampering with the doors, a break-in, or
damage to any windows. He called his supervisor and
the narcotics division to report what had been discov-
ered. . . . He estimated the apartment was fifty to sixty
feet off the ground. . . . The evidence was not initially
seized or moved.

"Gaddy, the first responder, also testified . . . [that]
he knew only that he was responding to a 'burglar
alarm,' but didn't know what he was venturing into.
'We prepared for the worst,' he said. Upon arrival, he,
Uccello and Robles went upstairs to the third floor.
They knocked on the outside door and got no answer.
Guns drawn, they entered the apartment. He testified
that 'we were just seeing if there was anyone in the
apartment or if anyone was hurt . . . .' As they went
through the apartment, they looked only in places
where a person could be hiding. . . . Like Uccello, he
had no idea who [the defendant] was or who lived at
apartment 330 when he arrived. . . .

"Detective Anthony Martinez, senior detective for
vice and narcotics, responded to 250 Main Street in
response to what had been observed in the bathroom.
He had learned that Uccello and Gaddy suspected that

someone might have been hiding in the bathroom or that an injured person was inside the bathroom. . . . After observing what had been found in the bathroom, he prepared an application for a search warrant, which was approved and then executed. The evidence seized . . . included 20.2 ounces of cocaine, ninety-one green pills, forty yellow pills, two scales, spoons, strainers and grinders with residue, a loaded, nine millimeter Browning Arms pistol, and a magazine and rounds for it. The loaded pistol, with a round in the chamber, was seized from a nightstand in the bedroom. . . . It was determined that the defendant had a permit for the pistol. Detective Martinez testified that he disabled the alarm system. He had no prior information relating to this location. . . .

"Michael Brightman, assistant manager of 250 Main Street for Harver Realty Advisors, testified [that] [o]n the morning of February 4, 2002, a maintenance worker fixed a malfunctioning heating unit in apartment 330. [The defendant] and a female were in the apartment when the work was done, starting at 8:30 a.m. and ending at 8:45 a.m. The alarm in the apartment went off between 2:15 and 2:30 p.m. He received a call from ADT, which wanted to know if he was aware of the alarm. Brightman told ADT he would ask maintenance to look into it and asked Robles to do so. [The defendant] called on another line while Brightman was still talking with ADT. Brightman told [the defendant] he had received a call from ADT in connection with the ongoing alarm. [The defendant] said he had just missed a call from ADT. The policy was to give Robles a key to check when it was possible that a burglary was occurring, or somebody was ill or someone had fallen in an apartment—when there was an emergency. . . . Apartment 330 was the only apartment in the building with an alarm system. . . .

"Robles testified [that] [h]e accompanied Uccello and Gaddy up to the third floor and opened the front door for them with a master key. He thought the police were 'looking for someone who was hiding.' He provided Uccello with a screwdriver from his work belt; Uccello used the screwdriver to open the bathroom door. . . .

"Testimony was also provided by Lucy DiGioia, an employee with ADT in Wallingford. ADT had contracted with the defendant for monitoring of the alarm system in apartment 330. ADT received a burglar alarm from the motion detector in the kitchen at 2:13 and 59 seconds p.m., according to ADT records. . . . ADT called the apartment at 2:15 and 14 seconds p.m., but there was no answer, so the police were called. According to notations contained [in an exhibit], at 2:19 and 26 seconds p.m., a representative from ADT 'spoke to [the defendant, who] stated that there were some men there fixing his heater but still wanted PD to g.' DiGioia construed this to mean that [the defendant] still wanted the police department to go to the premises. . . . DiGioia said that ADT signs a contract with customers providing that if a burglar alarm goes off, the premises will be called, but if nobody is home, 'we dispatch the police.' . . .

"The defendant argues that inconsistencies in the testimony render the state's witnesses unworthy of belief. For example, as the state acknowledges, there was conflicting testimony as to when the alarm was disabled and by whom; different witnesses also have different recollections concerning precisely where evidence was seized. The court disagrees, having personally observed the witnesses' testimony and having considered the full record. The inconsistencies, such as they exist, are relatively minor. Moreover, given the time that passed between the events in question and when the witnesses testified, some discrepancies are to be expected. The court finds the testimony of the

state's witnesses to have been credible and rejects the defendant's contention that discrepancies suggest that the witnesses were less than credible."

On the basis of these findings, the court concluded that the money and drugs seized in the bathroom of the apartment were not the fruit of prior police illegality. The court concluded that the state had proved by a preponderance of the evidence that the search fell within two exceptions to the warrant requirement; the court concluded that the emergency doctrine applied or, in the alternative, that the police entered all the rooms of the apartment with the defendant's consent. The court further concluded that, after entering the bathroom legally, the police seized the money and drugs, which were in the officers' plain view.

On July 30, 2004, the defendant entered a plea of nolo contendere, conditioned on his right to appeal from the court's denial of his motion to suppress. The court accepted the defendant's plea and determined that its denial of the motion to suppress was dispositive of the case. On September 24, 2004, the court sentenced the defendant to a total effective term of incarceration of eighteen years, execution suspended after eight years, followed by five years of probation. This appeal followed.

The defendant challenges the court's separate conclusions that the emergency doctrine applied with regard to the search of the bathroom and that the police entered the bathroom with his consent. Although the court did not hold that the exigent circumstances exception to the warrant rule applied in this case, the defendant also argues that the warrantless search of the bathroom was not legally permissible under that principle. See, e.g., *State* v. *Gant*, 231 Conn. 43, 64, 646 A.2d 835 (1994) (exigent circumstances exception to warrant requirement applies generally to those activities in

which police are "unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and . . . without seeking prior judicial authorization" [internal quotation marks omitted]), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). Finally, the defendant challenges the court's finding that the physical evidence seized from the bathroom was within the plain view of the officers.[2]

# I

## THE EMERGENCY DOCTRINE

The defendant first claims that the court improperly concluded that the entry into the bathroom fell within the emergency doctrine, an exception to the warrant rule. The defendant argues that the evidence did not permit a finding that the officers reasonably believed that a medical emergency involving a danger to human life existed so as to permit legally their search of the bathroom. We disagree.

Our review of the defendant's claim is governed by well established principles. "Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . [I]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light

---

[2] In his motion to suppress, the defendant claimed that the search and seizure violated his rights under the state and federal constitutions. Before this court, the defendant bases his claims under the federal constitution; he has not separately analyzed his claims under the state constitution. Accordingly, we will analyze the defendant's claims solely under the federal constitution. See *State* v. *McMurray*, 217 Conn. 243, 248 n.6, 585 A.2d 677 (1991).

We do not reach the merits of the defendant's claim that the search was not proper under the exigent circumstances exception to the warrant rule; the court did not rely on that exception.

of these facts will be reviewed de novo. . . . Conclusions drawn from [the] underlying facts must be legal and logical. . . . We must determine, therefore, whether on the basis of the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed [to justify the entry]. . . .

"[A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . Searches conducted pursuant to emergency circumstances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions. . . . [T]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. . . . The extent of the search is limited . . . [to] a prompt warrantless search of the area to see if there are . . . victims [of a crime] or if a [perpetrator] is still on the premises. . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search. . . .

"The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception. . . . An objective test is employed to determine the reasonableness of a police officer's belief that an emergency situation necessitates a warrantless intrusion into the home. . . . [The police] must have valid reasons for the belief that an emergency exception exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . The test is not whether

the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry. . . .

"Moreover, as we have explained, the emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 141–43, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

In asserting that the emergency doctrine did not apply under the circumstances of this case, the defendant essentially takes issue with the court's decision to credit as true the testimony of Brightman and Uccello. The defendant refers to evidence that, in a correspondence from Brightman prior to trial, Brightman had indicated that he had regarded the burglar alarm to reflect a possible burglary or a break-in. At trial, Brightman testified that he had regarded the burglar alarm to reflect "[a] possible burglary, somebody ill or, if somebody has fallen in the apartment, an emergency in the apartment." The defendant argues that, as an assistant manager for the apartment building, Brightman "knew there was no

panic alarm in the bathroom, and he also knew that the alarm was not related to a medical emergency." The defendant further argues: "The fair inference is that Brightman was attempting to help the state justify the police entry into the locked bathroom. This testimony of Brightman is not only suspicious, but seriously weakens his credibility. The logical conclusion is that the landlord and the police knew, after entering the apartment, that there had been no break-in or burglary involving the apartment and that they therefore did not have consent to go into the locked bathroom. They created an imaginary medical emergency within the locked bathroom in an attempt to justify their wrongful behavior in searching the locked bathroom."

The defendant also refers to Uccello's testimony concerning his reasons for entering the locked bathroom. Uccello testified, in relevant part: "I thought that somebody might be in need of medical assistance," and, "I thought there was a medical emergency." The defendant posits: "Uccello knew he was responding to a burglary alarm. He received no evidence from the landlord or any other source that there may be a medical emergency in the defendant's apartment. Uccello reasonably knew there was no medical emergency. This testimony of Uccello was put before the court for the sole purpose of attempting to justify his wrongful entry into the locked bathroom once he had entered the apartment and saw there were no exigent circumstances necessitating a further search. It puts into serious question Uccello's credibility as to all that he testified to."

Finally, in arguing that the emergency doctrine did not apply, the defendant asserts: "[T]he police had no evidence to even remotely suggest that there was a person within the locked bathroom in need of immediate medical aid. The alarm they were responding to was a burglar alarm. It was not reasonable for the police to believe there was an individual within the locked

bathroom in need of immediate aid who had activated the burglar alarm. The fair inference is that the burglar alarm could not even be activated from within the locked bathroom."

As a preliminary matter, we reject the defendant's invitation to second-guess the court's favorable assessment of the testimony of Brightman and Uccello. During the evidentiary hearing, the defendant availed himself of his right to challenge the credibility of these witnesses on the basis of, among other issues, inconsistencies in their testimony. The court, in its fact-finding function, rejected those arguments. This court does not revisit credibility determinations; it is the exclusive province of the trier of fact to resolve credibility determinations and to determine what weight, if any, to afford the competent evidence before it. See, e.g., *State v. Northrop*, 92 Conn. App. 525, 531, 885 A.2d 1270 (2005), cert. denied, 277 Conn. 905, 894 A.2d 988 (2006).

We next address the issue of whether the record supported the court's conclusion that it was reasonable for the police to believe that an emergency situation existed so as to render legal the officers' entry into the bathroom.[3] As we stated previously, the relevant inquiry is whether the empirical facts available to the police at the time of the entry justified an objectively reasonable belief that an emergency situation existed, a situation that implicates the community caretaking function of the police to protect and preserve life. *State v. Colon*, supra, 272 Conn. 142–43. It is unchallenged that the police had the following facts available to them at the time of their entry. Uccello and Gaddy went to the apartment in response to a breaking and entering alarm. Uccello learned when he arrived that he had been dispatched after ADT contacted the police concerning the

---

[3] We note that the defendant does not take issue with the entry into the apartment, but only the bathroom within the apartment.

alarm. Uccello and Gaddy could hear the alarm coming from within the locked apartment when they reached the third floor with Robles. When the officers arrived at the door to the apartment, their knocks were not met with an answer. After Robles opened the door with his master key, the officers searched in various rooms throughout the apartment in places where a person might hide. They did not find anyone. Ultimately, they discovered a bathroom in a bedroom within the apartment. The door to the bathroom was locked from the inside.

On the basis of this record, we conclude that it was objectively reasonable for the police to believe that someone was in the bathroom and that such person was in need of immediate aid. As the defendant acknowledges, the police were justified in entering the apartment under these circumstances. The police, when they arrived, were aware that a burglar alarm was activated only in the defendant's apartment; there was no building wide alarm. This alarm was sufficient to give rise to an objective suspicion that an occupant in the locked apartment in which the alarm had been activated was, either because of criminal activity or some other reason, in need of assistance. When the officers received no assurance that this was not the case after knocking at the apartment door, they entered the apartment to search for persons in need of assistance. This entry was justified under the emergency doctrine, and there is no basis in law or in fact to suggest that the justified entry of the apartment did not extend to every room within the apartment, in spaces where a person in need of assistance might be present. Were the police to have searched only those rooms that were readily accessible, they would have performed only a part of their community caretaking duties in the apartment.

It was objectively reasonable for the officers to suspect that a person had caused the alarm to be activated.

It was also objectively reasonable for the officers to expect to find such person in the locked apartment, the site of the alarm. When the officers did not find anyone in the other rooms of the apartment, they naturally focused their attention on the locked bathroom within the apartment, a place where a person might be found. The fact that the bathroom door was locked from the inside is significant. This fact provided an objective basis for a belief that someone was, indeed, inside the bathroom. The alarm was sounding in the apartment, the police were present at the apartment and there was no response when they announced their presence at the bathroom door. It was objectively reasonable for the police to suspect that the person behind the locked door under these circumstances was in need of assistance.

The court's findings further reflect that the search of the apartment was prompt, conducted in a manner such as to reflect the officers' limited purpose of finding persons suspected of being in need of immediate assistance and that the officers neither had any prior knowledge of the apartment nor of the defendant. As the court stated, there was "no evidence [whatsoever] that the initial entry, initial limited searches or entry into the bathroom were pretextual." These reasonable findings, while not dispositive of the issue of whether the emergency doctrine applied, strengthen our conclusion that the search was objectively reasonable under the emergency doctrine. The fact that a person in need of assistance was not present in the apartment does not in any way detract from the objectively reasonable interpretation of the facts that were before the police officers in their haste to render whatever assistance was necessary at the time they arrived at the scene of the alarm. See, e.g., *State* v. *Blades*, 225 Conn. 609, 621, 626 A.2d 273 (1993) (noting that in "cool morning of appellate review" court should not disregard "heated passion of

immediacy" that characterizes police function). Accordingly, we reject the defendant's claim that the emergency doctrine did not apply.[4]

## II

## PLAIN VIEW DOCTRINE

The defendant also argues that the evidence did not support the court's finding that the drugs and currency seized in the bathroom were in the officers' plain view. We disagree.

We already have determined, in part I, that the police were entitled to be present in the bathroom of the defendant's apartment. It is well established that a police officer, during a lawful search of a private area, who sees an item in plain view, the incriminating nature of which is immediately apparent, may seize such item without a warrant. *Coolidge* v. *New Hampshire*, 403 U.S. 443, 464–73, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). The seizure of such items in plain view is presumptively reasonable if there is probable cause to associate the item with criminal activity. *Payton* v. *New York*, 445 U.S. 573, 587, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). "The warrantless seizure of contraband that is in plain view is reasonable under the fourth amendment if two requirements are met: (1) the initial intrusion that

---

[4] The court also concluded, in the alternative, that the search was proper because the defendant consented to it. Although our holding with regard to the emergency doctrine resolves the issue of the legality of the search, we also hold that the police properly searched the defendant's apartment with the defendant's free and voluntary consent. The evidence supports the court's finding that by virtue of his statement to an agent of his alarm service, the defendant requested the police to respond to the alarm at his apartment. The defendant did not place any limitations on the scope of the investigation he authorized, and it was reasonable to find that the defendant authorized the police to enter the apartment and search in any areas where a perpetrator or a person in need of assistance reasonably might be present. It is well recognized that valid consent to enter and search a home is an exception to the warrant requirement. See *State* v. *Jones*, 193 Conn. 70, 78–79, 475 A.2d 1087 (1984).

enabled the police to view the items seized must have been lawful; and (2) the police must have had probable cause to believe that these items were contraband or stolen goods." (Internal quotation marks omitted.) *State* v. *Eady*, 249 Conn. 431, 437, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999). "The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no search within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point. . . . [T]he police need not ignore incriminating evidence in plain view while they are operating within the parameters of a valid search warrant or are otherwise entitled to be in a position to view the items seized." (Citation omitted; internal quotation marks omitted.) *State* v. *Outlaw*, 70 Conn. App. 160, 165, 797 A.2d 579 (2002).

As set forth previously, the court found that when Uccello and Gaddy lawfully entered the locked bathroom, they found an open cardboard shoe box filled with money. They also found bags of white powder—a substance later determined to be cocaine—as well as scales on the bathroom sink. The court determined that "[t]he evidence observed in the bathroom was found in plain view, and its incriminating character was immediately apparent, rendering it subject to seizure."

"Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally

and logically correct and whether they find support in the facts set forth in the memorandum of decision . . . . Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Days*, 89 Conn. App. 789, 794, 875 A.2d 59, cert. denied, 275 Conn. 909, 882 A.2d 677 (2005).

Although the defendant purports to claim that the evidence adduced at the hearing did not establish that the evidence seized was in plain view of the officers who entered the bathroom, the defendant does not argue that testimony elicited by the state did not support the court's finding that the evidence was in plain view of Uccello and Gaddy when they entered the locked bathroom. Our review of the record confirms that the testimony of Uccello and Gaddy provided an ample evidentiary basis for the court's findings in this regard; this testimony was substantial evidence in support of the court's decision.

There are several related aspects of the defendant's claim. The defendant claims that evidence concerning his conduct on February 4, 2002, would lead a rational trier of fact to infer that the drugs and money in the bathroom were not in plain view. Essentially, the defendant claims that evidence adduced during the hearing, that a maintenance worker repaired the heating system in the apartment at his behest that morning and that he requested the police to respond to the alarm at his apartment, supported a finding that the money and drugs were not in plain view in the locked bathroom

of the apartment. The defendant also refers to inconsistencies in the testimony of several witnesses and argues that "conflicting" accounts of what the police encountered in the bathroom reflected the fact that the police actually placed the drugs and money in plain view. The defendant argues: "The only fair inference to be drawn from these inconsistencies is that these items were not in plain view and were placed in plain view by the first two police officers and perhaps thereafter rearranged. The fact that police officers did not, upon entering the bathroom, actually observe these items in plain view would explain why the officers and detectives do not have the same recollection of [what] they observed. There was no initial image of these items in plain view for the police officers to recall. Their recollection of these items was in fact an attempt to recall how they themselves had arranged the items so as to be in plain view. Any plain view of these items was of their own creation."

It is axiomatic that the court was not bound to draw inferences from the evidence that were consistent with the defendant's interpretation of the evidence. The court was free to reject the defendant's interpretation of the evidence and to make factual determinations that were supported by the evidence. In its memorandum of decision, the court unambiguously stated that it rejected the defendant's challenges to the credibility of the state's witnesses, including Uccello and Gaddy, and found these witnesses to have testified credibly.

The defendant mounts a wholesale attack on the court's factual findings, asking this court to substitute his interpretation of the evidence and the credibility of witnesses in place of that of the trial court. As we stated previously, Uccello and Gaddy testified consistently with regard to the relevant fact that they immediately observed money and drugs when they opened the door

to the defendant's bathroom.[5] To the extent that the defendant argues that minor inconsistencies between the testimony of these witnesses exists, "[i]t is axiomatic that evidentiary inconsistencies are for the [trier of fact] to resolve, and it is within the province of the [trier of fact] to believe all or only part of a witness' testimony." (Internal quotation marks omitted.) *State v. Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005).

The defendant's claim reflects a flawed view of this court's role in considering appeals. This court does not retry facts; it can only determine whether competent evidence supports factual determinations made by the trial court. Evidence is presented before the trier of fact, not before this court. The trier of fact has an "opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility" that we do not. (Internal quotation marks omitted.) *State v. Flowers*, 85 Conn. App. 681, 692, 858 A.2d 827, cert. granted on other grounds, 272 Conn. 910, 863 A.2d 703 (2004). Where, as here, factual determinations rested in large measure on credibility assessments, we accept the reasonable credibility determinations made by the trier of fact. "[T]he finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the [finder of fact] . . . ." (Internal quotation marks omitted.) *State v. Morocho*, 93 Conn. App. 205, 210, 888 A.2d 164 (2006).

The judgment is affirmed.

In this opinion the other judges concurred.

[5] Uccello testified that when he entered the bathroom, he observed several clear plastic sandwich bags containing white powder as well as a scale resting on the vanity that surrounded the bathroom sink. Uccello further testified that he observed an open cardboard shoe box containing money located "on the ground or on the toilet bowl . . . ."

Gaddy testified that when he entered the bathroom, he observed a large bag of powder, a scale and money on the "toilet seat." Gaddy further testified that he observed money "underneath the sink in a shoe box with the lid open."