STATE OF CONNECTICUT *v.* KENNETH E. FAUSEL
(AC 28950)

Bishop, DiPentima and Mihalakos, Js.

Argued May 20—officially released August 26, 2008

*Steven B. Rasile*, special public defender, for the appellant (defendant).

*Kurtis Z. Piantek*, certified legal intern, with whom were *Bruce R. Lockwood*, assistant state's attorney, and, on the brief, *Kevin D. Lawlor*, state's attorney, and *Melanie Cradle*, assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Kenneth E. Fausel, appeals from the judgment of conviction rendered following his conditional plea of nolo contendere[1] to possession of a controlled substance with intent to sell in violation of General Statutes § 21a-277 (b). The defendant claims that the trial court improperly denied his motion to suppress certain evidence seized from his house. We agree and, accordingly, reverse the judgment of the trial court.

On June 30, 2006, the defendant filed a motion to suppress tangible evidence seized at his home by officers with the Milford police department on August 11, 2005. The defendant argued that the search of his home and the seizure of evidence violated his rights under the state and federal constitutions. On September 19, 2006, the court conducted an evidentiary hearing on the defendant's motion, and on November 2, 2006, the

---

[1] See General Statutes § 54-94a; Practice Book § 61-6.

court issued a memorandum of decision denying the motion to suppress.

The court set forth the following findings of fact: "On August 11, 2005, at approximately 11:20 a.m., Milford police officer Kenneth Rahn was on patrol when he observed a green Ford Probe with racing stripes operating with a license plate attached to the rear bumper with what appeared to be plastic ties. . . . Rahn ran the plate number, and it came back as expired and listed to a blue Chevrolet registered to a James Wayne . . . of 6 Shagbark Lane in Milford, who Rahn was familiar with. [Rahn] was aware [that Wayne] had previous arrests for narcotics and weapons offenses. After stopping the Ford Probe, Rahn approached the vehicle, but the operator fled at a high rate of speed once the officer left his vehicle. . . . Rahn testified that the operator continued to accelerate and entered Interstate 95 at exit thirty-seven. The Ford Probe crossed all established lanes of traffic into the left breakdown lane next to the barrier and maintained a high rate of speed. . . . Rahn did not attempt to chase the vehicle but radioed the description of the vehicle and the operator to the Milford police dispatcher who alerted other police of the incident. A short time later, a Milford police officer who was conducting traffic control at a construction site observed the vehicle on Housatonic Drive. After searching the general area, Milford Detectives [Nicholas] Ricci and [Steve] Staurovsky discovered the Ford Probe backed into a driveway of a house located at 33 Austin Road in Milford . . . . Two construction workers across the street told police that they saw a man matching Wayne's description drive into the driveway at 33 Austin Road, pull the license plate off the Ford [Probe] and enter the house. One detective went to the front door of 33 Austin Road and knocked on it but received no response. The second detective went to the side door and found it slightly

ajar. A check of the mailbox indicated that there was mail addressed to [the defendant], a Lisa Fausel and a Marcia DeCarlo. Initially, there was no response from inside the house, but after police announced that a dog was going to be released into the house, Wayne appeared and surrendered. When he was asked [whose] house it was, Wayne told police that the house was 'a friend's' and would not provide any other information.

"The Milford police, after securing Wayne, did a sweep of the house to determine if there was anyone else present. While checking an upstairs bedroom, Detective [Arthur] Huggins saw two small blue bags on a dresser, which he recognized from his training and experience as bags often used in packaging crack cocaine. Based on his observations, the Milford police applied for a search warrant for 33 Austin Road. A subsequent search of the house by warrant resulted in the seizure of a number of items, such as marijuana seeds and stems, cash, a loaded shotgun, a digital scale and other items of what could be identified as drug paraphernalia. The defendant was later arrested as a result of the search."

In concluding that the search and seizure were warranted under the emergency doctrine exception to the warrant requirement, the court specifically cited to the following facts that were available to the police on August 11, 2005: "The person who started the chain of events, Wayne, was known to police as someone who had prior arrests involving weapons and drugs; Wayne was observed by . . . Rahn driving a vehicle with an expired license plate that belonged to another vehicle; Wayne waited until . . . Rahn was on foot approaching his vehicle to suddenly drive away at a high rate of speed; [u]pon entering Interstate 95 and maintaining a high rate of speed, Wayne recklessly crossed all lanes of traffic and continued his attempt to elude capture by driving in the left breakdown lane; [a]lthough Wayne

lived at 6 Shagbark Lane in Milford, he drove into the driveway of a house located at 33 Austin Road which was miles away from Shagbark Lane; [t]he police found the Ford Probe backed into the driveway at 33 Austin Road so that the license plate could not be observed from the street; [w]itnesses reported to the police that Wayne removed the license plate from the Ford Probe and entered the 33 Austin Road house; [w]hen police arrived at the house, Wayne would not respond to their calls to come outside; [w]hen he surrendered to police, Wayne volunteered little information about the house or who lived there other than that 'a friend' lived there and that there was no one in the house; [b]y checking the mail in the mailbox, police determined that at least three people resided at that address and [that] Wayne was not one of them." The court further found that "[t]he police witnesses readily admitted that the perimeter of the house was secured when they made the decision to check the house. The police, however, could not guarantee that there was anyone else inside the house or [that] Wayne had encountered anyone when he entered and remained in the house. The police also did not know if Wayne had made a decision to enter this particular house before doing so or if he had randomly selected it."

On the basis of these findings, the court concluded that "Wayne's furtive and desperate efforts to elude capture by the Milford police and his choice of picking 33 Austin Road to do so provided the framework for meeting the test of reasonableness that is needed to allow an exception to the warrant requirement." (Internal quotation marks omitted.)

On March 7, 2007, the defendant entered a plea of nolo contendere, conditioned on his right to appeal from the court's denial of his motion to suppress. The court accepted the defendant's plea and determined that its denial of the motion to suppress was dispositive

of the case. On June 18, 2007, the court sentenced the defendant to five years incarceration, execution suspended, followed by three years of probation. This appeal followed.

"Well known federal and state constitutional principles govern the exclusion of evidence derived from a warrantless entry into a home. The fourth amendment to the United States constitution provides: The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. Entry by the government into a person's home, is the chief evil against which the wording of the Fourth Amendment is directed. . . . [W]arrantless searches and seizures inside a home, are presumptively unreasonable . . . and the state bears the burden of showing that an exception to the warrant requirement exists." (Citations omitted; internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 681–82, 610 A.2d 1225 (1992).

"The terms exigent circumstances and emergency doctrine are often used interchangeably when discussing warrantless entries into a home. The term exigent circumstances, however, generally refers to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization. . . . The emergency exception refers to another type of warrantless entry that evolves outside the context of a criminal investigation and does not involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Klauss*, 19 Conn. App. 296, 300, 562 A.2d 558 (1989).

The defendant challenges the court's conclusion that the emergency doctrine applied to the circumstances of this case. Although the court did not hold that the exigent circumstances exception to the warrant rule applied in this case, the defendant also argues that the warrantless search of his home was not legally permissible under that principle. We address each claim in turn.

I

The defendant first claims that the court improperly concluded that the entry into his home fell within the emergency doctrine exception to the warrant requirement. The defendant argues that the evidence did not permit a finding that an officer would reasonably believe that a warrantless entry was necessary to assist a person in need of immediate aid. We agree.

The emergency doctrine is one of the recognized exceptions to the federal constitutional requirement that searches and seizures be conducted pursuant to a warrant. See *Mincey* v. *Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). "[T]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. . . . The extent of the search is limited, involving 'a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.' . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search." (Citations omitted.) *State* v. *Magnano*, 204 Conn. 259, 266, 528 A.2d 760 (1987). "[G]iven the rationale for this very limited exception, the state actors making the search must have reason

to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." (Internal quotation marks omitted.) *State v. Geisler*, supra, 222 Conn. 691.

"The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception. . . . An objective test is employed to determine the reasonableness of a police officer's belief that an emergency situation necessitates a warrantless intrusion into the home. . . . [The police] must have valid reasons for the belief that an emergency exception exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry." (Citations omitted; internal quotation marks omitted.) *State v. Colon*, 272 Conn. 106, 142–43, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

"[T]he emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . ." (Internal quotation marks omitted.) Id., 143.

"Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . [I]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo. . . . Conclusions drawn from [the] underlying facts must be legal and logical. . . . We must determine, therefore, whether, on the basis of the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed [to justify the entry]." (Citations omitted; internal quotation marks omitted.) Id., 141–42. Thus, we review the "applicability of the emergency doctrine . . . de novo . . . based upon the subordinate facts found by the trial court, to determine whether an emergency existed that would justify the warrantless entry into the dwelling." *State* v. *Geisler*, supra, 222 Conn. 693.

At the suppression hearing, Huggins testified that he did not know if anyone else was inside the defendant's house but was concerned about the possibility that someone might be injured and in need of assistance. By way of explanation for the entry, Huggins suggested that Wayne's illegal entry of the home insinuated a burglary and the possibility that someone was injured. Before Huggins entered, however, Wayne indicated that no one else was in the house, and he indicated that his friend, the defendant, lived there. As corroboration, Wayne provided the defendant's name, which was consistent with the information in the possession of the officers. On this basis, there was no indication that Wayne's entry into the house was illegal.[2] In sum, there

[2] The facts of this case are readily distinguishable from those in *State* v. *Ortiz*, 95 Conn. App. 69, 895 A.2d 834, cert. denied, 280 Conn. 903, 907 A.2d 94 (2006), in which this court upheld a warrantless search under the emergency doctrine. In *Ortiz*, the officers were responding to a burglar alarm and, while investigating, came upon a bathroom door, which was

is no evidence in the record to indicate that the officers ever had any reason to believe that there was anybody inside the house in immediate danger or in need of aid. A mere concern that someone *might* be inside and *might* be in need of immediate assistance does not warrant police intrusion into a private dwelling under the emergency doctrine. Thus, the police were not justified in entering the defendant's house pursuant to the emergency exception.

## II

The defendant also claims that exigent circumstances did not exist for a warrantless entry of his home. We agree.

As with the emergency doctrine, the applicability of the exigent circumstances doctrine is subject to de novo review. *State* v. *Aviles*, 277 Conn. 281, 292, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). "The term, exigent circumstances, does not lend itself to a precise definition but generally refers to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization. . . . It is well established in Connecticut, however, that the test for the application of the doctrine is objective, not subjective, and looks to the totality of the circumstances. . . . Specifically, [t]he test of exigent circumstances . . . is whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or

---

locked from the inside, indicating that someone might be inside. Id., 72–73. Here, there was no support for an objective belief that a burglary had taken place and, therefore, that a victim of a crime was inside the house in need of assistance.

might, during the time necessary to procure a warrant, endanger the safety or property of others. This is an objective test; its preeminent criterion is what a reasonable, well-trained police officer would believe, not what the arresting officer actually did believe." (Citations omitted; internal quotation marks omitted.) Id., 293.

Here, when the police entered the defendant's home, Wayne was already in custody. There was, therefore, no risk that he could flee or that he posed a threat to public safety. Although the state contends that the officers believed that a felony, namely, a burglary, had been committed or was in progress, and that others may have been hiding in the house, there is no basis in the record to support this contention. As noted, there was no evidence that anyone else was in the house. Furthermore, because Wayne had indicated that the defendant, a friend of his, resided there, there is no indication that he did not have permission to be in the house. Additionally, because the police were pursuing Wayne for traffic violations, it is difficult to imagine what evidence relating to those violations might have been subject to destruction if the officers had not entered the premises at that time. Accordingly, the exigent circumstances doctrine is not applicable to the case at hand.

The judgment is reversed and the case is remanded with direction to grant the defendant's motion to suppress and for further proceedings in accordance with the law.

In this opinion the other judges concurred.