STATE OF CONNECTICUT *v.* KENNETH E. FAUSEL
(SC 18249)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.

Argued January 5—officially released April 27, 2010

*Bruce R. Lockwood,* senior assistant state's attorney, with whom, on the brief, were *Kevin D. Lawlor,* state's attorney, and *Melanie Cradle,* assistant state's attorney, for the appellant (state).

*Steven B. Rasile,* special public defender, for the appellee (defendant).

VERTEFEUILLE, J. In this certified appeal,[1] the state appeals from the judgment of the Appellate Court reversing the judgment of conviction of the defendant, Kenneth E. Fausel, following his conditional plea of nolo contendere, of possession of a controlled substance with intent to sell in violation of General Statutes § 21a-277 (b). *State* v. *Fausel*, 109 Conn. App. 820, 822, 953 A.2d 891 (2008). On appeal to this court, the state claims that the Appellate Court improperly reversed the judgment of conviction after concluding that the defendant's motion to suppress should have been granted. We agree, and, accordingly, we reverse the judgment of the Appellate Court.

The Appellate Court summarized the following relevant facts as found by the trial court: " 'On August 11, 2005, at approximately 11:20 a.m., Milford Police Officer Kenneth Rahn was on patrol when he observed a green Ford Probe with racing stripes operating with a license plate attached to the rear bumper with what appeared to be plastic ties. . . . Rahn ran the plate number, and it came back as expired and listed to a blue Chevrolet registered to a James Wayne . . . of 6 Shagbark Lane in Milford, [with whom] Rahn was familiar . . . . [Rahn] was aware [that Wayne] had previous arrests for narcotics and weapons offenses. After stopping the Ford Probe, Rahn approached the vehicle, but the operator fled at a high rate of speed once the officer left his vehicle. . . . Rahn testified that the operator continued to accelerate and entered Interstate 95 at exit thirty-seven. The Ford Probe crossed all established lanes of traffic into the left breakdown lane next to the

---

[1] We granted the state's petition for certification to appeal from the Appellate Court limited to the following issue: "Did the Appellate Court properly reverse the trial court's suppression ruling that the police were justified in entering the defendant's house without a warrant?" *State* v. *Fausel*, 289 Conn. 940, 959 A.2d 1007 (2008).

barrier and maintained a high rate of speed. . . . Rahn did not attempt to chase the vehicle but radioed the description of the vehicle and the operator to the Milford police dispatcher who alerted other police of the incident. A short time later, a Milford police officer who was conducting traffic control at a construction site observed the vehicle on Housatonic Drive. After searching the general area, Milford Detectives [Nicholas] Ricci and [Steve] Staurovsky discovered the Ford Probe backed into a driveway of a house located at 33 Austin Road in Milford . . . . Two construction workers across the street told police that they saw a man matching Wayne's description drive [the vehicle] into the driveway at 33 Austin Road, pull the license plate off the Ford [Probe] and enter the house. One detective went to the front door of 33 Austin Road and knocked on it but received no response. The second detective went to the side door and found it slightly ajar. A check of the mailbox indicated that there was mail addressed to [the defendant], a Lisa Fausel and a Marcia DeCarlo. Initially, there was no response from inside the house, but after police announced that a dog was going to be released into the house, Wayne appeared and surrendered. When he was asked [whose] house it was, Wayne told police that the house was "a friend's" and would not provide any other information.

" 'The Milford police, after securing Wayne, did a sweep of the house to determine if there was anyone else present. While checking an upstairs bedroom, Detective [Arthur] Huggins saw two small blue bags on a dresser, which he recognized from his training and experience as bags often used in packaging crack cocaine. Based on his observations, the Milford police applied for a search warrant for 33 Austin Road. A subsequent search of the house by warrant resulted in the seizure of a number of items, such as marijuana seeds and stems, cash, a loaded shotgun, a digital scale

and other items of what could be identified as drug paraphernalia. The defendant was later arrested as a result of the search.' " Id., 823–24.

The defendant subsequently filed a motion to suppress the tangible evidence seized from his home, asserting that the police improperly entered and searched his home in violation of his right to protection from warrantless searches under the state and federal constitutions.[2] Following an evidentiary hearing, the trial court issued a memorandum of decision denying the defendant's motion. The trial court concluded that the emergency exception to the warrant requirement justified the police entry into the defendant's home.

The Appellate Court summarized the trial court's findings and conclusions as follows: "In concluding that the search and seizure were warranted under the emergency doctrine exception to the warrant requirement, the [trial] court specifically cited to the following facts that were available to the police on August 11, 2005: 'The person who started the chain of events, Wayne, was known to police as someone who had prior arrests involving weapons and drugs; Wayne was observed by . . . Rahn driving a vehicle with an expired license plate that belonged to another vehicle; Wayne waited until . . . Rahn was on foot approaching his vehicle to suddenly drive away at a high rate of speed; [u]pon entering Interstate 95 and maintaining a high rate of

---

[2] The constitution of Connecticut, article first, § 7, provides that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

The fourth amendment to the United States constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

speed, Wayne recklessly crossed all lanes of traffic and continued his attempt to elude capture by driving in the left breakdown lane; [a]lthough Wayne lived at 6 Shagbark Lane in Milford, he drove into the driveway of a house located at 33 Austin Road which was miles away from Shagbark Lane; [t]he police found the Ford Probe backed into the driveway at 33 Austin Road so that the license plate could not be observed from the street; [w]itnesses reported to the police that Wayne removed the license plate from the Ford Probe and entered the 33 Austin Road house; [w]hen police arrived at the house, Wayne would not respond to their calls to come outside; [w]hen he [finally] surrendered to police, Wayne volunteered little information about the house or who lived there other than that "a friend" lived there and that there was no one in the house; [b]y checking the mail in the mailbox, police determined that at least three people resided at that address and [that] Wayne was not one of them.' The [trial] court further found that '[t]he police witnesses readily admitted that the perimeter of the house was secured when they made the decision to check the house. *The police, however, could not guarantee that there was anyone else inside the house or [determine] whether Wayne had encountered anyone when he entered and remained in the house. The police also did not know if Wayne had made a decision to enter this particular house before doing so or if he had randomly selected it.*' " (Emphasis added.) Id., 824–25. As a result, the trial court concluded that the police were objectively reasonable in believing an emergency was occurring within the home, thereby necessitating a warrantless emergency entry. Id., 825.

The defendant subsequently entered a plea of nolo contendere to the charge of possession of a controlled substance with intent to sell,[3] conditioned on his right

---

[3] The defendant also was charged with several other drug offenses, which were nolled by the state.

to appeal the trial court's denial of his motion to suppress. Id. The trial court recognized that its denial of the motion was dispositive of the case, and, accordingly, accepted the plea. Id., 825–26. The trial court thereafter sentenced the defendant to five years incarceration, execution suspended, followed by three years of probation. Id., 826. The defendant appealed from the judgment of conviction to the Appellate Court. Id. The defendant claimed that the emergency exception to the warrant requirement did not justify the warrantless entry by the police officers into his home. Id., 827. The Appellate Court agreed and reversed the judgment of conviction, concluding "that the evidence did not permit a finding that an officer would reasonably believe that a warrantless entry was necessary to assist a person in need of immediate aid." Id. "[T]here is no evidence in the record to indicate that the [police] officers ever had any reason to believe that there was anybody inside the house in immediate danger or in need of aid." Id., 829–30.[4] This appeal followed.

On appeal to this court, the state claims that the Appellate Court improperly reversed the judgment of conviction on the ground that the trial court incorrectly denied the defendant's motion to suppress. In particular, the state asserts that the Appellate Court failed to give adequate deference to the factual findings of the trial court and its conclusion that the police officers reasonably believed a warrantless emergency entry was necessary. The defendant responds that the Appellate Court properly reversed the judgment of conviction. Specifically, the defendant contends that it was not objectively reasonable for the police officers to con-

---

[4] The Appellate Court additionally determined that the exigent circumstances exception to the warrant requirement did not apply to the warrantless search. *State* v. *Fausel*, supra, 109 Conn. App. 830–31. On appeal in this court, the state relies exclusively on the emergency doctrine, and therefore we do not address the exigent circumstances exception.

clude that a warrantless emergency search was necessary on the basis of the facts known at the time of entry. We agree with the state.

We begin with the applicable standard of review. "[I]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo. . . . Conclusions drawn from [the] underlying facts must be legal and logical. . . . We must determine, therefore, whether, on the basis of the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed when they entered the [dwelling] . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 141–42, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).[5] In addition, "we are mindful that [i]t is well settled that, in a certified appeal, the focus of our review is not on the actions of the trial court, but the actions of the Appellate Court. We do not hear the appeal de novo." (Internal quotation marks omitted.) *State* v. *Morelli*, 293 Conn. 147, 153, 976 A.2d 678 (2009).

We next undertake a brief review of our well established principles regarding warrantless searches. "It is a basic principle of [f]ourth [a]mendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." (Internal quotation marks omitted.) *State* v. *Guertin*, 190 Conn. 440, 446, 461 A.2d 963 (1983). "Entry by the government into a person's home . . . is the chief evil against which the wording of the [f]ourth [a]mendment is directed."

[5] In the present case, the defendant does not challenge any of the trial court's factual findings.

(Internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 681, 610 A.2d 1225 (1992). For this reason, "[i]t is clear that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." (Internal quotation marks omitted.) *State* v. *Magnano*, 204 Conn. 259, 265, 528 A.2d 760 (1987). As a result, "[w]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the [f]ourth [a]mendment." (Internal quotation marks omitted.) *Brigham City* v. *Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). "Searches conducted pursuant to emergency circumstances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions." *State* v. *Blades*, 225 Conn. 609, 617–18, 626 A.2d 273 (1993).

The emergency exception to the warrant requirement allows police "to enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Brigham City* v. *Stuart*, supra, 547 U.S. 400. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (Internal quotation marks omitted.) *Mincey* v. *Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). As a result, the use of the emergency doctrine "evolves outside the context of a criminal investigation and does not involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence." *State* v. *Klauss*, 19 Conn. App. 296, 300, 562 A.2d 558 (1989). "Nevertheless, the emergency doctrine does not give the state an unrestricted invitation to enter the home. [G]iven the rationale for this very limited

exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. . . . The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." (Citations omitted; internal quotation marks omitted.) *State* v. *Geisler*, supra, 222 Conn. 691–92. "The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception." *State* v. *Blades*, supra, 225 Conn. 618.

Recent application of this doctrine can be found in *State* v. *Colon*, supra, 272 Conn. 106, and *State* v. *Ortiz*, 95 Conn. App. 69, 895 A.2d 834, cert. denied, 280 Conn. 903, 907 A.2d 94 (2006). This court, in *State* v. *Colon*, supra, 144–45, concluded that the police were justified in reasonably believing that an emergency situation was occurring. In *Colon*, the police were summoned to a hospital in order to investigate the suspicious death of a young child. Id., 132–33. The emergency room physician had noticed the severe blunt force trauma to the victim's head in addition to "several bruises, scrapes, gouge marks, swelling and discoloration . . . as well as evidence that the victim's arm had been broken," and the police subsequently were notified about a suspected case of child abuse. Id. The victim's mother ultimately implicated the defendant in the death. Id., 133. The police officers then learned that the defendant had abruptly taken the victim's three year old sister away from her home and to an apartment belonging to the defendant's mother. Id., 132, 136. Upon arriving at the apartment, the police officers heard someone running

through the apartment and heard a child crying. Id., 136. When they received no answer after knocking on the door of the apartment, the police officers broke through the door and entered the apartment. Id., 136–37. This court concluded "that it was reasonable for the police to believe that an emergency situation existed, namely, that the health and safety of the victim's sister was in jeopardy." Id., 145. "[T]he facts known to the police at the time of entry . . . gave rise to a reasonable belief that an emergency situation existed." Id., 147.

The Appellate Court additionally found that the police were objectively reasonable in conducting a warrantless entry pursuant to the emergency exception in *State* v. *Ortiz*, supra, 95 Conn. App. 83. See *State* v. *Fausel*, supra, 109 Conn. App. 829–30 n.2. In *Ortiz*, police officers responded to a breaking and entering alarm originating from a multiple dwelling apartment building. *State* v. *Ortiz*, supra, 72. When no one answered the door of the particular apartment from which the alarm was sounding, the police officers used a key provided by an employee of the alarm monitoring company to enter the apartment. Id. Upon entering, the police officers searched only the areas in which a person could have hidden or fallen as a result of an injury. Id., 72–73. The bathroom door, however, was locked from the inside. Id. Concerned that "somebody was hiding in there or it was somebody injured," the police officers used a screwdriver to open the door. (Internal quotation marks omitted.) Id. Upon opening the door, the police encountered an extensive array of drug paraphernalia. Id., 73. The Appellate Court concluded that it was reasonable for the police to believe that a person had activated the alarm and had injured the resident of the apartment while conducting the breaking and entering. Id., 82–83. As a result, the police officers were justified in searching any location where a person could have been lying in an injured state. Id., 83. Such a search logically included the bathroom, particularly since the

door was locked from the inside, indicating that a person was, at one time, present in the bathroom. Id.

In the present case, contrary to the conclusions of the Appellate Court, the factual findings of the trial court similarly demonstrated that the police officers were objectively reasonable in believing that an emergency situation existed in the house. Wayne, an individual with a history of drug and weapons offenses, engaged in dangerous, reckless and evasive driving on a major interstate highway to avoid arrest. *State* v. *Fausel*, supra, 109 Conn. App. 824. Wayne chose to hide in a house that the police officers quickly deduced was not his own, but rather the residence of three other individuals, none of whom had any apparent connection to Wayne. Id., 825. None of these residents answered the police officers' shouts into the house requesting that any individuals identify themselves and exit the premises. Id., 824. Wayne also delayed exiting the house, only surrendering when the police officers threatened to release a police dog into the residence. Id. He therefore extended his stay within the house, increasing the amount of time in which he could have created or maintained an emergency situation within the premises. Additionally, Wayne only told the police officers that a "friend" lived in the house; he did not provide any other information about the residents, further suggesting a lack of knowledge about the house and the residents.[6] Id., 825.

---

[6] The testimony of Huggins on direct examination by the assistant state's attorney at the suppression hearing about Wayne's response created ambiguity in the record:

"[Assistant State's Attorney]: . . . [W]hat information, if any, did you get that [Wayne] resided or belonged in that house?

"[Huggins]: We didn't at first. *The only thing he told me was a friend lived there, his name was [the defendant].*

"[Assistant State's Attorney]: Okay. And did he give you any other information, with regards to who lived in that house?

"[Huggins]: No. We asked him how we could get in contact with [the defendant], where he worked, [tele]phone numbers or anything of that nature and he had nothing for us. . . .

Considering Wayne's criminal history with weapons and drugs, his extreme attempt to avoid arrest, his reluctance to surrender, and his lack of any apparent connection with the house and its residents, it was objectively reasonable for the police officers to conclude that Wayne had selected a house at random to break into and hide, thereby committing a burglary and possibly endangering the residents in the process. It is well established that "there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable. Included are those in which entry is made . . . *to seek possible victims of violence in premises apparently burglarized recently . . . .*" (Emphasis added.) 3 W. LaFave, Search and Seizure (4th Ed. 2004) § 6.6 (a), pp. 459–61.[7] The rationale is that burglary is

"[Assistant State's Attorney]: . . . [W]as he able to give you any other additional information on his right to be in that house?

"[Huggins]: *No. You know, I asked him if he lived there, [and] he said, 'No, his friend lived there.'* I said, 'Where does your friend work? What's a [tele]phone number for him? I have to have something where we can confirm whether or not you belong here or if you just randomly picked this house to go into or you hurt somebody in the house.' I didn't know at that point any more than that." (Emphasis added.)

The record is ambiguous regarding whether Wayne identified the defendant by name or only as a friend. We cannot resolve this ambiguity because the trial court made no finding that Wayne identified the defendant by name. Rather, the trial court determined that "Wayne volunteered little information about the house or who lived there other than that 'a friend' lived there . . . ." As a result, the trial court concluded that "[t]he police . . . could not guarantee that there was anyone else inside the house or whether Wayne had encountered anyone when he entered and remained in the house. The police also did not know if Wayne had made a decision to enter this particular house before doing so or if he had randomly selected it."

[7] Several courts in other states similarly have adopted this view. See, e.g., *In re Sealed Case 96–3167*, 153 F.3d 759, 770 (D.C. Cir. 1998) (noting in dictum that in responding to burglary, police may make warrantless entry to determine if residents were hiding or injured); *United States* v. *Tibolt*, 72 F.3d 965, 970–71 (1st Cir. 1995) (upholding warrantless search for injured or immobilized victim, based on reasonable belief that home was location of security alarm, upon finding back door unlocked and receiving no response to calls inside residence), cert. denied, 518 U.S. 1020, 116 S. Ct. 2554, 135 L. Ed. 2d 1073 (1996); *Carter* v. *State*, 405 So. 2d 957, 960 (Ala. Crim. App.) (where probable cause exists for burglary, immediate entry

a crime of violence and bystanders are likely to be injured by the perpetrator. See *State* v. *Amado*, 254 Conn. 184, 201, 756 A.2d 274 (2000) ("crimes against the person like . . . burglary are, in common experience, likely to involve danger to life in the event of resistance by the victim" [internal quotation marks omitted]).

In the present case, the police officers identified three possible residents of the residence, none of whom responded to the police officers' repeated calls. It was thus objectively reasonable for the police officers to believe, based on the facts known at the time, that the residents were either injured or had been incapacitated by Wayne. The police officers therefore were justified in concluding that an emergency situation existed within the residence that necessitated a warrantless entry to search for possible victims.[8] The Appellate

lawful to ensure no injured, disabled, or dying victim), cert. denied, 405 So. 2d 962 (Ala. 1981); *State* v. *Carroll*, 97 Md. App. 234, 238, 629 A.2d 1247 (1993) ("an apparent house-breaking, either in progress or recently committed, constitutes exigent circumstances," partially "to ascertain whether there are victims in need of assistance"), aff'd, 335 Md. 723, 646 A.2d 376 (1994); *In re Forfeiture of $176,598*, 443 Mich. 261, 271, 505 N.W.2d 201 (1993) (police entry "at the scene of an apparent breaking and entering" necessary because "intruders may have restrained or, worse yet, injured or killed the inhabitants").

[8] The defendant asserts that Huggins' explanation that he entered the house in order to search for victims is a false justification designed to mask his true intent, which was to seek evidence of additional criminal conduct or accomplices. Huggins testified on direct examination as follows:

"[Assistant State's Attorney]: And what was your concern at that point in time [after Wayne was arrested]?

"[Huggins]: My concern was that there was somebody in the house that was either injured, tied up, mugged. At that point it's a million things [that] can go through your mind that somebody's injured in the house and I couldn't just walk away [with Wayne] possibly [having] injured somebody and they're unconscious in the house."

On cross-examination, the defendant attempted to impeach the officer with language from the police report that he wrote immediately following the incident. In that report, the police officer only referenced a fear of accomplices hiding from the police, rather than individuals requiring emergency attention, as justification for the warrantless entry. This report, how-

Court thus improperly determined that "[t]here is no evidence in the record to indicate that the officers ever had any [objective] reason to believe that there was anybody inside the house in immediate danger or in need of aid." *State* v. *Fausel,* supra, 109 Conn. App. 829–30.

Moreover, this court previously held that "we do not read [prior case law] to require direct evidence of an emergency situation . . . ." *State* v. *Colon,* supra, 272 Conn. 147; see also *State* v. *Ortiz,* supra, 95 Conn. App. 83 ("[t]he fact that a person in need of assistance was not present in the apartment does not in any way detract from the objectively reasonable interpretation of the facts that were before the police officers in their haste to render whatever assistance was necessary"); 3 W. LaFave, supra, § 6.6 (a), pp. 452–53 (This standard "must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences. As one court usefully put it, the question is whether 'the officers would have been derelict in their duty had they acted otherwise.' This means, of course, that it 'is of no moment' that it turns out there was in fact no emergency.").

Direct evidence of an emergency is not required because the emergency exception to the warrant requirement arises out of the caretaking function of the police. It has been observed that "[t]he police have complex and multiple tasks to perform in addition to identifying and apprehending persons committing seri-

ever, was marked for identification only. It subsequently was used for impeachment purposes, but not entered as a full exhibit. The trial court, pursuant to its role as fact finder, credited the police officer's testimony, finding that "[t]he police, however, could not guarantee that there was anyone else inside the house or whether Wayne had encountered anyone when he entered and remained in the house."

ous criminal offenses; by design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventive patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis." (Internal quotation marks omitted.) 3 W. LaFave, supra, § 6.6, p. 451. As this court previously has noted, "the emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Blades*, supra, 225 Conn. 619; see also *Brigham City* v. *Stuart*, supra, 547 U.S. 406 ("[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing [or hockey] referee, poised to stop a bout only if it becomes too one-sided").[9]

---

[9] As former Chief Justice (then Judge) Burger stated in his frequently cited opinion in *Wayne* v. *United States*, 318 F.2d 205, 212 (D.C. Cir. 1963): "[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. . . . [T]he business of policemen and firemen is *to act*, not to speculate or meditate . . . . People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." (Emphasis in original.) See also 3 W. LaFave,

It therefore is of no moment that the police officers in the present case did not encounter an emergency when they entered the residence. They were objectively reasonable in believing that an emergency situation existed within the residence. The Appellate Court thus improperly concluded that "[a] mere concern that someone *might* be inside and *might* be in need of immediate assistance does not warrant police intrusion into a private dwelling under the emergency doctrine." (Emphasis in original.) *State* v. *Fausel*, supra, 109 Conn. App. 830. That conclusion does not comport with the objectively reasonable standard as applied in this state.

The judgment of the Appellate Court is reversed and this case is remanded to that court with direction to affirm the trial court's judgment.

In this opinion the other justices concurred.

supra, § 6.6 (a), pp. 459–66 (citing cases demonstrating many situations where entry for emergency aid is reasonable).