******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

PRESCOTT, J., dissenting. Contrary to the majority opinion, I conclude, on the basis of the subordinate facts found by the trial court and the rational inferences drawn from those facts, that the police who responded to the 911 call in this matter reasonably could have believed that an emergency situation existed that justified their warrantless entry into the apartment of the defendant, Shaila M. Curet. Accordingly, I further conclude that the trial court properly denied the defendant's motion to suppress the evidence obtained by the police as a result of their warrantless entry, and I would affirm the judgment of conviction rendered by the court following the defendant's conditional plea of nolo contendere. Therefore, I respectfully dissent.[1]

Although the majority opinion sets forth in some detail the facts as found by the court in its oral ruling on the defendant's motion to suppress,[2] I summarize them again briefly with an emphasis on those facts most relevant to my determination of whether the police reasonably made a warrantless entry into the defendant's apartment pursuant to the emergency doctrine. On the afternoon at issue, Anthony Cruz, who lived in the defendant's apartment building, called 911 to report what he described as a break-in and loud altercation. Cruz explained to the 911 operator that he had observed an unknown man wearing a hooded sweatshirt enter the apartment building. Thereafter, he heard what he thought were gunshots associated with a loud altercation that was happening in and around the building's laundry room, which was located on the first floor of the building, directly below his apartment. Cruz told the 911 operator that he later saw two men—the individual he originally had observed entering the building and a different, unidentified man—leave the building and depart in separate vehicles. Cruz also relayed to the operator that he had found a knife in the laundry room with white paint on it. He believed someone may have used the knife to try to break into the defendant's apartment, which was located across from the laundry room.[3]

Officer Raim Zulali was dispatched to respond to the 911 call. Much of the information provided by Cruz to the 911 operator was relayed to him on the display in his police cruiser before he arrived at the scene. When Zulali arrived at the building at around 4 p.m., the apartment building was locked, but he was admitted by Cruz, whom he questioned regarding his 911 call. Cruz told Zulali that he did not recognize the man wearing the hooded sweatshirt, but that he saw him exiting a white vehicle and became suspicious when the man tried to conceal his identity as he approached the front door to the building. Cruz stated that the man may have used the knife that Cruz later found in the laundry room to

gain access to the building. Cruz also told Zulali that, shortly after the man gained entry to the building, he heard someone knocking very hard on the door to the defendant's apartment. He then heard an altercation begin, starting in the hallway outside of the defendant's apartment and moving to the laundry room, which was only a few feet away. It was after the altercation had moved into the laundry room that Cruz believed he heard two gunshots. He next saw a man run out the front door of the building and leave in the white vehicle, following which he saw another male exit the building and leave in a different car. Cruz told Zulali that, upon investigating, he found a knife in the laundry room.

Importantly, Cruz also stated that he thought that one of the residents of the defendant's apartment was involved in the altercation. Cruz informed Zulali that a male and a female lived in the defendant's apartment, and that their vehicle still was parked in the parking lot. There is nothing in the record, however, to suggest that Cruz ever indicated to the police that either of the two men that he had observed fleeing from the building after the altercation was the male resident of the defendant's apartment. Zulali checked the vehicle that Cruz had indicated belonged to the residents of the defendant's apartment. The vehicle was unoccupied.

When Zulali inspected the hallway outside of the defendant's apartment, he saw pry marks on the frame of the defendant's apartment door and found fresh paint chips on the floor nearby. He also saw what looked to be freshly made footprints on the wall of the hallway. Inside the laundry room, Zulali observed that the room was in disarray, with the washing and drying machines having been disturbed from their normal positions. Zulali found a single spent shell casing on the floor and observed a bullet hole in the exit side of the doorframe of the laundry room's door. Zulali also observed a mark on the floor and a hole in the wall that he believed may have been caused by a ricocheted bullet. In addition to the evidence of gunfire, Zulali found a small and fresh blood like stain on the wall adjacent to the laundry room door.

On the basis of his observations, Zulali called for additional police assistance and, having developed a concern that someone may have been shot or stabbed during the altercation under investigation, he asked a dispatcher to call area hospitals to ascertain whether any gunshot or stabbing victims recently had arrived for treatment. Zulali went door to door and interviewed residents of the building to determine whether anyone had been injured.[4] He also knocked on the door of the defendant's apartment. When he did not receive any response, he attempted to open the door of the apartment, but it was locked. He also tried to look into the apartment's windows, but the blinds were all closed.

Zulali called his superior officer, Sergeant Gaetano

Tiso, explained the evidence that he had found thus far, and expressed his concern that someone might be in the defendant's apartment. Tiso and several additional officers responded to the scene. When they arrived, Zulali again reviewed the evidence with Tiso, repeating his concern that someone might be in the defendant's apartment and injured. The police proceeded to force open the door of the defendant's apartment in a search for any injured occupant.[5] Approximately one hour had passed from the time that Zulali first arrived at the apartment building until the warrantless entry into the defendant's apartment occurred.

As aptly described in the majority opinion, multiple items of inculpatory evidence were observed in plain view by the officers as they conducted their search, which later were seized pursuant to a subsequently obtained warrant. The defendant was arrested and charged with possession of more than one-half ounce of cocaine in violation of General Statutes § 21a-278 (a) and operation of a drug factory in violation of General Statutes § 21a-277 (c). Thereafter, she filed a motion to suppress the evidence seized as a result of the warrantless entry of her apartment, arguing in relevant part that the emergency doctrine was inapplicable because no reasonable police officer would have believed that there was an emergency requiring the warrantless entry into her apartment. The state countered, inter alia, that the police officers properly entered and searched the defendant's apartment under the emergency doctrine because they reasonably could have believed that someone may have been seriously injured. The court agreed with the state that the officers' warrantless search was reasonable. In reaching its decision, the court relied on the testimony of both Zulali and Cruz, both of whom the court found credible.

The defendant claims on appeal that the court improperly concluded that the police's warrantless entry into her apartment was justified under the emergency exception because no reasonable officer could have concluded that entry was necessary to alleviate an emergency. The state responds that, under the facts known at the time, it was objectively reasonable for an officer to believe that someone may have been in the defendant's apartment who was seriously injured and in need of medical assistance and, thus, the warrantless entry was justified pursuant to the emergency doctrine. I agree with the state.

Before turning to my analysis, I first set forth the relevant legal parameters of the emergency doctrine exception to the warrant requirement and our well settled standard of review governing this claim. "[A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . Searches conducted pursuant to emergency cir-

cumstances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions. . . . [T]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. . . . The extent of the search is limited, involving a prompt warrantless search of the area . . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search. . . .

"The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception. . . . An objective test is employed to determine the reasonableness of a police officer's belief that an emergency situation necessitates a warrantless intrusion into the home. . . . [The police] must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings. . . . The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Blades*, 225 Conn. 609, 617–19, 626 A.2d 273 (1993); see also *State* v. *DeMarco*, 311 Conn. 510, 534–37, 88 A.3d 491 (2014).

"The purpose of the emergency doctrine is to allow the police to make a warrantless entry to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." (Internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 230, 100 A.3d 821 (2014). As our Supreme Court has explained, "the emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society.[6] [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life." (Citation omitted; footnote added; internal quotation marks omitted.) *State* v. *Blades*, supra, 225 Conn. 619. Importantly, our Supreme Court has warned that, in evaluating the

reasonableness of a warrantless intrusion under the emergency doctrine, "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable." (Internal quotation marks omitted.) *State* v. *DeMarco*, supra, 311 Conn. 532.

"[I]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo. . . . Conclusions drawn from the underlying facts must be legal and logical. . . . We must determine, therefore, whether, on the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed."[7] (Internal quotation marks omitted.) *State* v. *Blades*, supra, 225 Conn. 617.

For the following reasons, I conclude, on the basis of the facts known to the police at the time they decided to enter the defendant's apartment without a warrant and the reasonable inferences that may be drawn from those facts, that the police reasonably could have concluded that a medical emergency involving danger to human life existed, thus justifying their warrantless entry.

First, it is significant that Zulali was dispatched to the apartment building in response to a 911 call alerting the police to an attempted burglary during which gunshots may have been fired and a knife was found. As argued by the state on appeal, any burglary comes with a potential for violence; it is objectionably reasonable that any trained law enforcement officer responding to a call of a break-in at an apartment building would contemplate that a resident or bystander encountering the perpetrator might be injured. See *State* v. *Fausel*, 295 Conn. 785, 798–99, 993 A.2d 455 (2010); *State* v. *Ortiz*, 95 Conn. App. 69, 82, 895 A.2d 834, cert. denied, 280 Conn. 903, 907 A.2d 94 (2006).[8] Accordingly, from the outset, responding police, in exercising their community caretaking function, reasonably would have been concerned that someone in the apartment building may have been injured.

Second, there was ample evidence present at the scene from which the police reasonably could have inferred that someone either participating in the altercation that Cruz overheard or a victim of the altercation might have been injured seriously and be in need of medical assistance. Cruz was only an earwitness and never directly observed the altercation. Thus, the mere fact that, after the altercation ended, he saw two men fleeing the scene did not necessarily mean that there were only two persons present during the relevant events. Given the fact that Cruz heard loud banging on the defendant's apartment door immediately preceding

the altercation, it is not unreasonable to infer that the altercation involved someone in the defendant's apartment who either interrupted an attempted burglary, was the intended victim of the burglary, or had some other reason to engage in an argument that spilled out into the hallway and into the laundry room. Furthermore, Cruz had indicated to both the 911 operator and Zulali that he had heard what he believed was gunfire at the time of the altercation. His belief was corroborated by the bullet holes and ricochet marks observed in the laundry room, as well as the discovery of a shell casing. The fact that the bullet hole was located on the exit side of the laundry room door supports an inference that someone may have been trying to escape from the shooter. Further, Zulali observed a fresh blood like stain in the laundry room. It is a reasonable inference to conclude from that discovery, particularly in conjunction with the knowledge of recent gunfire associated with a burglary and some type of altercation, that a person might have been injured and in need of immediate aid. See *State* v. *Blades*, supra, 225 Conn. 621.

Third, the majority's assertion that there was "limited evidence that directly pertained to the defendant's apartment" is belied by the record. There is, in fact, a significant factual basis on which the police reasonably could have linked any injury that occurred in the laundry room to someone who may have been inside the defendant's locked apartment. Cruz indicated to the police that the events originated at the defendant's doorway. Further, Cruz stated that he believed that one of the residents of the apartment was involved in the altercation. It is not an unreasonable inference to conclude that any party injured during the altercation could have fled from the laundry room back into the defendant's apartment, locking the door behind him or her. The pry marks on the doorframe of the defendant's apartment door and the paint chips further link the defendant's apartment to the altercation, either because the altercation began as a result of a break-in or an attempted break-in or because someone attempted to pursue a fleeing victim. In short, under the totality of the circumstances, it would have been reasonable for officers to be concerned that someone shot, stabbed, or otherwise injured during the altercation could have sought refuge in the defendant's apartment and might be in need of medical attention. The fact that no one answered the door could have meant that the injured party had lost consciousness, making the need for an emergency warrantless entry that much more compelling.[9]

I further agree with the state that the fact that the defendant's vehicle was still at the premises and that the police were unable to look through windows to observe the interior of the residence increased rather than diminished the likelihood "that there was a person inside the apartment who was unresponsive as the

result of an injury . . . ."

The majority states that the fact that the defendant's vehicle was found in the parking lot does not support a belief that an emergency existed in the defendant's apartment. I disagree because the evidence cannot be viewed in isolation. As I have already indicated, there was evidence that linked the gunfire and the altercation in the laundry room directly to the defendant's apartment. A reasonable inference to be drawn from the fact that the vehicle owned by one of the residents of the defendant's apartment was still parked outside is that the owner of the vehicle may still be home. When viewed in conjunction with the fact that no one answered when Zulali knocked on the door to the defendant's apartment, and all other residents had been accounted for, the presence of the defendant's vehicle lends additional support for a reasonable inference to be drawn that the vehicle's owner was home yet incapacitated and unable to answer the door or call out for help. Certainly, this inference is more compelling than the majority's suggestion that a reasonable officer should have inferred from the vehicle's presence outside the apartment building that the defendant's apartment was unoccupied.

Finally, unlike the majority, I attach far less significance to the fact that one hour of time passed between the police's initial response to the 911 call and their eventual decision to enter the defendant's apartment without a warrant. Although this lapse of time is, of course, not irrelevant to an assessment of the reasonableness of the officers' belief, the amount of time elapsed, as the majority concedes, is not a dispositive factor in the required analysis. After all, in any particular investigation, it may not be until after some additional inquiries or assessment of the evidence gathered by the police has occurred that an officer reasonably may conclude that an emergency situation exists.

In *State* v. *Blades*, supra, 225 Conn. 609, our Supreme Court upheld a warrantless entry into a defendant's apartment on the basis of the emergency doctrine. In *Blades*, the court concluded that the police's entry into the defendant's apartment was reasonable despite the fact that two hours had passed between the time that the police first were contacted about a missing person and when they entered the defendant's apartment without a warrant. Id., 615–16. During those two hours, the officer in *Blades* investigated and discovered blood on the back door of the defendant's apartment building, which eventually led the police to "believe that someone was injured or in danger in the apartment and that it would be necessary to enter to protect or preserve life." Id., 616. The fact that the police took one hour in the present case to evaluate the evidence and come to the conclusion that an injured person may have been in the defendant's apartment does not, in my mind, render that conclusion objectively unreasonable.[10]

Although the majority opinion states that, in the present case, Zulali did not discover "substantial evidence . . . clearly demonstrating" that someone in the defendant's apartment was at risk of losing life or limb, clear and substantial evidence is not the standard governing our inquiry. In my view, this statement mischaracterizes the relevant legal standard.[11] The standard is one of objective reasonableness under the facts as known at the time. The fact that our Supreme Court may have concluded in a particular case that there was clear, demonstrable evidence supporting the decision by the police to make a warrantless entry in *that particular case* does not mean that the same level of evidence *always* is necessary to justify entry under the emergency doctrine. To require otherwise would risk placing far too tight of a restriction on the important public safety function we entrust to the police, who often must quickly assess ambiguous or conflicting information and make immediate decisions "in circumstances that are tense, uncertain, and rapidly evolving." (Internal quotation marks omitted.) *Kentucky* v. *King*, 563 U.S. 452, 466, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011); see also *State* v. *DeMarco*, supra, 311 Conn. 536–37. In my estimation, and contrary to the analysis of the majority, the fact that Zulali was unable to discover any definitive evidence as to the whereabouts of the residents of the defendant's apartment, including by interviewing other residents, supported the reasonableness of his decision that he needed to be sure that no one was in the apartment injured and in need of medical assistance.[12]

As the majority opinion recognizes, the emergency exception does not require that the police always have *direct* evidence of an emergency situation. Rather, it only requires that they know *some articulable facts at the time of entry* that reasonably could lead them to conclude that they should dispense with the necessity of obtaining a warrant.

On the basis of the totality of the facts, unlike the majority, I conclude that the trial court properly denied the defendant's motion to suppress the evidence found pursuant to the police officers' legitimate emergency entry of her apartment. Accordingly, I would affirm the judgment of the trial court and, thus, respectfully dissent.

[1] Because I conclude that the police officers' warrantless entry was reasonable under the emergency doctrine exception to the warrant requirement, I need not reach the issue of whether the police had probable cause to enter the apartment pursuant to the exigent circumstances exception.

[2] I note that the record does not contain a signed copy of the transcript of the court's oral memorandum of decision as required pursuant to our rules of appellate procedure. See Practice Book § 64-1 (a). "In cases in which the requirements of Practice Book § 64-1 have not been followed, this court has declined to review the claims raised on appeal due to the lack of an adequate record." *State* v. *Brunette*, 92 Conn. App. 440, 446, 886 A.2d 427 (2005), cert. denied, 277 Conn. 902, 891 A.2d 2 (2006). This court nonetheless has reviewed claims on appeal if an unsigned transcript has been provided and we were able to discern the portions of the transcript constituting the court's decision. See id. Because the defendant filed an

unsigned transcript of the hearing at which the court rendered its oral ruling on the motion to suppress, I would review her claim despite the technically inadequate record.

[3] Although Cruz told the operator that he did not think anyone currently was at home in the defendant's apartment, there is nothing in the record indicating that Cruz' belief was founded on any personal knowledge or observation. Thus, it would have been reasonable for the police not to have placed much weight on his statement in assessing whether an injured person in need of medical care may have been in the defendant's apartment. I also disagree with the majority's suggestion that the trial court's reliance on the 911 call in rendering its ruling on the motion to suppress means that it necessarily credited Cruz' belief regarding the occupancy of the apartment. See footnote 2 of the majority opinion. Further, as I discuss later in my dissent, there were additional facts learned by the police during their investigation that reasonably could be viewed as contradicting Cruz' statement to the operator, including his statement that he thought that one of the residents of the defendant's apartment was a participant in the altercation and the presence of the defendant's vehicle in the building's parking lot.

[4] The court found that Zulali was able to interview someone from each of the units in the apartment building other than the defendant's.

[5] The majority notes that six officers, including Zulali and Tiso, entered the apartment and that they breached the door with a battering ram. In my view, the number of officers involved and their means of entry are irrelevant to the issue of whether their entry was reasonable under the emergency doctrine.

[6] "Police often operate in the gray area between their community caretaking function and their function as criminal investigators. Often there is no bright line separating the one from the other; the emergency doctrine relies on an objective test wherein the reasonableness of the officer's belief is assessed on a case-by-case basis." *State* v. *Blades*, supra, 225 Conn. 619.

[7] I am cognizant of our Supreme Court's instruction that "when a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *DeMarco*, supra, 311 Conn. 519. In the present case, the defendant does not challenge any of the trial court's factual findings, arguing only that those findings do not support its ultimate legal conclusion.

[8] The majority makes much of the fact that the present case is factually distinguishable from *Fausel*, which the state cites in support of the proposition that burglary is a crime of violence. It is true that, unlike in *Fausel*, the police here were not aware of the identities of the individuals involved in the altercation and, thus, whether they may have had any prior criminal history. Further, no one in the present case witnessed anyone enter the defendant's apartment or observe anyone emerge from the defendant's apartment to engage in the altercation. The majority contends that the pry marks and paint chips that Zulali observed only supported a conclusion that someone other than a resident of the apartment had attempted forcibly to enter the defendant's apartment, but that this was not evidence that the attempt was successful. I disagree that such a conclusion must be drawn from that evidence. Such evidence would have been present whether or not entry was successfully gained. Moreover, this evidence does not bear on the question of whether a resident of the apartment had fled back into the apartment after having engaged in the altercation in and around the laundry room.

In any event, I do not find the majority's discussion of *Fausel* persuasive. Nowhere in the *Fausel* decision does our Supreme Court suggest that all the facts and circumstances present in *Fausel* must exist before the police can reasonably exercise their authority to make a warrantless search under the emergency doctrine. In fact, the court clearly states that "there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 798. Our inquiry is whether the specific facts and circumstances confronting the police *in this case* would have led the police to an objectively reasonable belief that a warrantless entry was required to protect life and limb.

[9] The majority states that "[t]he court did not find any facts supporting a theory or conclusion that an injured person in the laundry room retreated to the defendant's apartment or that the *one-half centimeter* blood like

stain and other evidence in the laundry room supported the theory that an individual in the defendant's apartment was in need of emergency medical assistance." In support of this statement, the majority focuses too narrowly on the size of the stain and the fact that no blood like stains were observed on or outside of the door to the defendant's apartment or in the hallway leading to the defendant's apartment, and that no bullet holes or shells were found near the door to the defendant's apartment. The absence of this evidence, however, does nothing to diminish the significance of the fresh blood like substance that was found or the other evidence that I have indicated connects the altercation in the laundry room with the defendant's apartment. Nor does its absence render the actions taken by the police unreasonable per se. Furthermore, the majority fails in my opinion to take proper account of the fact that the defendant's apartment door was mere feet from the laundry room, not, as the majority suggests, "in a separate area of the building."

[10] In analyzing the significance of the one hour time period, the majority makes contradictory use of the fact that the police entered the defendant's apartment before they had received any response from area hospitals about potential shooting or stabbing victims seeking treatment. The majority seems to suggest that the police's failure to wait before entering demonstrated some rush to judgment on the part of the police in entering the defendant's apartment. Yet, in the same breath, the majority suggests that it is partly because the police did not enter earlier that too much time had elapsed for there to have been a true emergency. It is unclear from the majority opinion how the police could have avoided such a catch-22 situation.

[11] The majority's use of the term "substantial evidence" appears to come from boilerplate it cites from *State* v. *Kendrick*, supra, 314 Conn. 222. As that phrase is properly used, it refers to the heightened standard that a reviewing court applies in assessing the subordinate factual findings of a trial court with respect to issues implicating a party's constitutional rights, such as a motion to suppress grounded on an alleged violation of the fourth amendment. See also footnote 6 of this opinion. The majority opinion, however, misapplies the standard by suggesting that a police officer may make a warrantless entry under the emergency doctrine only if there is *substantial* evidence that *clearly* demonstrates the existence of an emergency. But that simply is not the requisite standard. See *State* v. *Blades*, supra, 225 Conn. 618–19.

[12] In footnote 6 of its opinion, the majority states that the "*most reasonable* interpretation of the facts is that two men, after entering the building, unsuccessfully attempted to enter the defendant's apartment." This statement admits that *other reasonable* interpretations of the facts also existed. The inquiry for a reviewing court is not to choose the most reasonable scenario, but only to consider if *some* reasonable view of the facts would have led the police to believe that an emergency existed, justifying a warrantless search.

---